# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SANDY M. HOMEL** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **CENTENNIAL SCHOOL DISTRICT, et al** | : | **NO.  11-1996** |

### <u>MEMORANDUM OPINION</u>

**Savage, J.**                                                    **December 21, 2011**

        In her meandering "shotgun complaint,"[1] Sandy Homel makes claims based on a
multitude of legal theories against her former employer, Centennial School District ("CSD").
She alleges First Amendment retaliation under § 1983; sex discrimination under § 1983,
Title VII, and the Pennsylvania Human Relations Act (PHRA); retaliation for filing sex
discrimination complaints under Title VII and the PHRA; and age discrimination under the
ADEA and the PHRA.  Each of her counts incorporates by reference all the allegations of
its predecessors, leaving to us the onerous task of matching each of her several years
worth of factual allegations with a cause of action.

        CSD has moved for summary judgment on all counts. For the purpose of
considering CSD's motion for summary judgment, we consider Homel's arguments in her
response to the motion as best we can identify them.

        We hold that CSD is entitled to summary judgment on Homel's First Amendment
and ADEA claims.  Homel has, however, established that there are triable issues of fact
related to her sex discrimination and Title VII/PHRA retaliation claims.  Therefore, we shall

---

        [1] *See Opdycke v. Stout*, 233 F. App'x 125, 127 n.1 (3d Cir. 2007) (citing *Strategic Income Fund, L.L.C.
v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295 (11th Cir. 2002)).

grant in part and deny in part the summary judgment motion.

## Background

The last several years have been tumultuous ones for Centennial School District's administration.  The district has had four superintendents in four years, and its school board has been divided by political factions and personal quarrels.  Sandy Homel found herself at the center of much of this imbroglio.

The school district is divided into three geographic regions: Warminster, Warminster/Ivyland (collectively, the "Warminster regions"), and Southampton.  Three of the school board's nine members are elected from each of these three regions.  As a result, six of the board members are elected from the Warminster regions and three from Southampton.

The divide between the Warminster and Southampton board members is more than a matter of geography.  According to the testimony of several school board members and district administrators, the board members have formed factions that often split along regional lines.  On a number of issues, the board is divided roughly between the six members of the Warminster majority and the three members of the Southampton minority.  One such issue is Sandy Homel.

Homel began her career with CSD in 1997 when she was hired as director of secondary education.  She has held a number of administrative positions during her tenure.  In 2006, CSD promoted Assistant Superintendent Michael Masko to become superintendent in July 2007.  Prior to Masko officially assuming the superintendency, Homel interviewed with him for the position of assistant superintendent.  To Homel's

surprise, Masko offered her a different position–assistant to the superintendent.  No one at CSD had held this position before, and it carried a lower salary than assistant superintendent.   Unlike assistant superintendent, the position of assistant to the superintendent is not created by the Pennsylvania School Code.  According to Homel, no woman had served as assistant superintendent at CSD.[2]  Despite her misgivings, Homel accepted the assistant to the superintendent position.[3]

Seven months later, CSD offered to promote Homel to assistant superintendent. CSD first gave Homel a copy of Masko's old assistant superintendent contract to review because hers was not ready.  When Homel received her own contract, she was surprised to find a "termination without cause" provision that was not in Masko's contract.  According to Homel, CSD denied her any opportunity to negotiate the contract or to have it reviewed by an attorney, and informed her that the school board would not ratify her contract without the "termination without cause" provision.[4]  Homel accepted the promotion to assistant superintendent.

In February and March of 2008–shortly into Homel's tenure as assistant superintendent–school board member Mark Miller, a member of the Southampton minority,

---

[2] However, a woman had served as district superintendent.  Nancy Reid was superintendent from 1993 to 2001.

[3] The parties dispute whether Homel retained her existing administrative duties after she took the position of assistant to the superintendent.  Homel claims that she worked three positions–assistant to the superintendent, director of elementary education, and director of secondary education–while only being paid for one.  She claims that when she eventually became acting superintendent she worked four administrative positions while only being paid for one.  CSD counters that Homel only worked in one position at a time, and that the other positions were vacant.  It claims that Homel was empowered to delegate the duties of those vacant positions to other administrators, and that it eventually hired a consultant to assist her in doing so while she served as acting superintendent.

[4] CSD denies that it did not give Homel an opportunity to negotiate her contract or have it reviewed by a lawyer.

3

approached Homel on at least two occasions and asked her about the purchase of a large kiln for the high school's art department.  The kiln purchase allegedly had been made at Masko's direction while he served as assistant superintendent.  Miller was apparently concerned that Masko had purchased the kiln without the school board's approval and without following the mandatory bidding procedures for making such purchases.  Miller also thought it suspicious that Masko's wife was a teacher in the art department when the kiln was purchased.

Homel agreed with Miller that the purchase appeared suspicious, and eventually provided Miller with a paper record of the transaction.  Homel did not bring this information to the full school board, but only worked through Miller.  Miller and fellow board member Cynthia Mueller–also a member of the Southampton minority–apparently took the lead on investigating the kiln purchase.  Masko resigned as superintendent in June 2008, allegedly at the behest of the school board.

Homel claims that the board members in the Warminster majority disapproved of her actions during Miller's investigation and wanted to damage her career at CSD.  She claims that some board members blamed her for Masko's resignation because they believed she was disloyal in revealing his potential wrongdoing.  She also claims that members of the Warminster majority were angry for her working through two members of the Southampton minority, rather than bringing the issue to the full board.  In her view, the Warminster majority believed that she was aligned with Miller and Mueller to undermine its power.

The board appointed Homel acting superintendent in July 2008.  Homel claims that, during her tenure in February 2009, school board member Jane Lynch approached her

with a *quid pro quo* arrangement.  According to Homel, Lynch asked her for help in getting her grandchild into kindergarten, even though the grandchild was too young to make the cutoff age.  Homel testified that Lynch, knowing that Homel hoped to become full-time superintendent, offered to help her get the school board votes she needed in exchange for the favor.[5]   Homel claims that she rejected the offer and informed the school board president Thomas Reinboth, but that Reinboth failed to take any action.

Homel interviewed for the full-time superintendent position in early 2009.  Shortly thereafter, she was informed that the school board had decided to hire another candidate. Three board members voted for and six board members voted against her application to move beyond the initial interview stage.  Miller and Mueller of Southampton were two of the board members who voted for Homel.[6]   The school board then unanimously selected Thomas Turnbaugh, who had served as superintendent of another district, to become CSD's superintendent.  Homel continued to serve as acting superintendent throughout the 2008-2009 school year and until August 2009, when Turnbaugh officially took over.

The parties disagree on why Homel was not selected for superintendent in 2009. According to CSD, the board members preferred Turnbaugh in part because he, unlike Homel, had a doctorate and had prior experience as a superintendent in another district. Homel argues that Turnbaugh's doctorate is pretext because at least two previous superintendents did not have one.  Instead, she argues that the school board's decision was politically motivated.  She says that she could not garner the five votes she needed

---

[5] Lynch and CSD deny that this occurred.  They claim that Lynch merely asked Homel for advice on whether to enroll her grandchild in kindergarten for the upcoming school year or to wait for the following year.

[6] Andrew Pollack from Warminster voted for Homel's application to move beyond the first round. Joseph Simpson from Southampton voted against.

because of the fallout from the kiln purchase incident and her refusal to accept Lynch's *quid pro quo*. She believes that a majority of the board had turned against her.

The district denies that either the kiln purchase controversy or her allegations against Lynch had anything to do with the board's decision not to promote her. It does not dispute that Homel became entangled in board politics. CSD claims that the board members who voted against her believed that she had become a divisive figure in the district's administration. They felt that she had aligned herself with the Southampton minority–particularly Miller and Mueller–to the detriment of the full board. They believed that she regularly met with and provided information to Miller and Mueller without sharing it with the other board members.

The tumult within CSD's administration continued under Turnbaugh. The district's business manager, human resources manager, special education supervisor, and facilities engineering and services director left during his tenure. Two female administrators filed internal complaints against him. One of those administrators was Donna Dunar, who claimed that Turnbaugh had sexually harassed her. During the pendency of this action, Dunar filed a federal suit against CSD, Turnbaugh, and board member Andrew Pollock for sex discrimination, sexual harassment, and retaliation. Dunar has filed an affidavit in support of Homel in this case.

Homel claims that Turnbaugh regularly embarrassed her, berated her, undermined her authority, excluded her, and devalued her work. On January 7, 2010, Turnbaugh reminded her that, under her contract, she could be terminated without cause. The next day, Turnbaugh informed her that she was being removed from her position and placed on leave with pay. The following Monday, Turnbaugh handed her a letter stating that she

was being placed on administrative leave under the "no cause termination" provision of her contract.

Homel quickly filed an internal "hostile environment" complaint against Turnbaugh. She claims that, in keeping with its practice of not taking women's discrimination complaints seriously, CSD failed to meaningfully investigate her complaint. Homel filed a charge with the U.S. Equal Employment Opportunity Commission (EEOC) on April 13, 2010, claiming that CSD had discriminated against her based on her age and sex by failing to hire her as superintendent, removing her without cause, undermining her authority, and generally abusing and humiliating her. She claims that CSD made no serious attempt to resolve this or any of her future EEOC charges.

The school board never formally ratified Turnbaugh's decision to put Homel on administrative leave. However, the board did discuss that decision. Six of the board members agreed with it. The three dissenters were Miller, Mueller, and Katherine Driban, all of whom are from Southampton.[7] The board members who opposed Homel claim to have done so for the same reason they did not select her to be superintendent in 2009–they felt that she had become a divisive figure in the school administration and continued to share information with Miller and Mueller to the detriment of the full board.

On May 11, 2010, while Homel remained on forced leave, CSD promoted two younger employees, one of whom was male, to cover some of Homel's previous responsibilities. Homel filed a second EEOC charge on June 15, 2010, alleging that those promotions were evidence that her removal was the product of age and sex bias in

---

[7] Driban replaced Simpson on the school board in May 2009.

violation of the ADEA and Title VII.  She also alleged in that charge that CSD forced her to work multiple jobs while only paying her for one.

In August, the school board voted to formally terminate Homel's employment at the end of her contract.[8]  Again, the vote was six to three, with the three board members from Southampton in the minority.  The six members who voted for termination claim that they considered this a procedural step formalizing Homel's removal.

Turnbaugh resigned as superintendent in December 2010.[9]  Homel–who was still on leave–again applied for the position.  Once again the count was six to three with the three members from Southampton supporting her application.  Ultimately, the board selected Jennifer Cressman, who is 22 years younger than Homel.

Homel filed two additional EEOC charges while she remained on forced leave.  On January 11, 2011, she filed a charge alleging that CSD had discriminated against her based on age and sex by terminating her.  She also alleged that her termination was in retaliation for her previous EEOC charges.  On May 11, 2011, she filed another charge, alleging that CSD's decision to hire Cressman constituted age and sex discrimination and was done in retaliation for her three previous EEOC charges.

## Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of

---

[8] Homel's contract was set to automatically renew on June 30, 2011 unless the school board voted to terminate it.

[9] CSD did not cite any official reasons for Turnbaugh's resignation.  Homel alleges that Turnbaugh resigned because of Dunar's sexual harassment allegations.

law."  Fed. R. Civ. P. 56(a).  Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In examining the motion, we must draw all reasonable inferences in the nonmovant's favor. *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159-60 (3d Cir. 2003).

The initial burden of demonstrating there are no genuine issues of material fact falls on the moving party.  Fed. R. Civ. P. 56(a).  Once the moving party has met its burden, the nonmoving party must counter with "'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  The nonmovant must show more than the "mere existence of a scintilla of evidence" for elements on which she bears the burden of production.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Bare assertions, conclusory allegations or suspicions are not sufficient to defeat summary judgment.  *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).  Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).

**First Amendment Retaliation**

Homel argues that the school board retaliated against her for engaging in constitutionally protected speech.  She claims that the board denied her a promotion to superintendent and later removed her from her position as assistant superintendent because she reported to Miller alone, not to the entire board, that Masko's kiln purchase

was unusual.[10]  Homel argues that her discussion of the purchase with Miller led several board members to believe that Homel had aligned herself with Miller and Mueller against the other members.  She also argues that some board members felt that she had betrayed Miller by reporting the purchase.

To succeed on her First Amendment retaliation claim, Homel must demonstrate that her speech is protected by the First Amendment and was a substantial factor in CSD taking its retaliatory action.  *Gorum v. Sessoms*, 561 F.3d 179, 184 (3d Cir. 2009) (citing *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006) ("*Kutztown*")); *see also Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005).  Whether Homel's speech is protected is a question of law.  *Gorum*, 561 F.3d at 184.  Whether it was a substantial factor in CSD's actions against her is a question of fact.  *Id*.  If Homel meets her burden as to both elements, the burden shifts to the district to demonstrate that it would have taken the same action had the speech not occurred.  *Id.*  (citing *Green v. Phila. Hous. Auth.*, 105 F.3d 882, 885 (3d Cir. 1997)).

As a threshold matter, we must decide whether Homel's statements to Miller were protected speech.  Public employees speaking on matters related to their employment are not afforded the same protection under the First Amendment as are private citizens.  *See Garcetti v. Ceballos*, 547 U.S. 410, 418-19 (2006); *see also Rutan v. Republican Party of Ill.*, 497 U.S. 62, 95 (1990) (Scalia, J., dissenting) (listing cases).  When a public employer

---

[10] Homel filed her original complaint on March 23, 2011, which was within the two-year statutory period.  *See Kach v. Hose*, 589 F.3d 626, 634 (3d Cir. 2009) (holding that the statute of limitations for § 1983 claims in Pennsylvania is two years).  Although she made the statements to Miller in early 2008, she alleges that the district retaliated for those statements on March 30, 2009, when she was informed she would not be hired as superintendent, and on January 11, 2010, when she was removed from her position as assistant superintendent.

disciplines an employee for making certain statements, it presumably does so not as a government regulator of private conduct but rather as an employer trying to run its business. *Garcetti*, 547 U.S. at 418-19. Still, a government employee remains a citizen, and may speak out as a citizen about matters of public concern. *Id.* at 419. The government employer may only impose those speech restrictions that are necessary for it to operate efficiently and effectively. *Id.* (citing *Connick v. Myers*, 461 U.S. 138, 147 (1983)).

The First Amendment protects a public employee's statements when: (1) the employee speaks as a citizen and not in her capacity as an employee; (2) her statement involves a matter of public concern; and (3) the government employer is not justified in treating her differently from a member of the general public for making the same statements.[11] *Gorum*, 561 F.3d at 185 (quoting *Kutztown*, 455 F.3d at 241).

## *Homel Was Not Speaking as a Public Citizen*

The critical question for determining whether Homel spoke to Miller as a citizen, rather than as a public employee, is whether Homel made her statements "pursuant to" her job responsibilities such that her speech "owes its existence" to those responsibilities. *Garcetti*, 547 U.S. at 421; *Cindrich v. Fisher*, 341 F. App'x 780, 786 (3d Cir. 2009); *see also Weintraub v. Bd. of Educ.*, 593 F.3d 196, 201 (2d Cir. 2010). This inquiry presents a mixed question of law and fact. *Reilly v. City of Atl. City*, 532 F.3d 216, 227 (3d. Cir. 2008) (quoting *Foraker v. Chaffinch*, 501 F.3d 231, 240 (3d Cir. 2007)).

---

[11] The first two prongs overlap. Notably, the Supreme Court in *Garcetti* articulated the first two prongs as a single inquiry. 547 U.S. at 418.

Homel argues that her statements to Miller are protected because she was speaking not as assistant superintendent, but as a citizen concerned about a potentially illegal purchase with taxpayers' money.  She argues that because monitoring and reporting such purchases were not part of her "official" job responsibilities, she was not speaking to Miller in her official capacity.[12]

Contrary to Homel's argument, we determine whether an employee speaks pursuant to her job responsibilities based on a practical consideration of what her job really entails, rather than a narrow delineation of enumerated "official" versus "unofficial" duties.  *See Garcetti*, 547 U.S. at 424-25 ("The proper inquiry is a practical one.  Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties . . . .").  Taking a practical view of Homel's role in the CSD administration, we conclude that she spoke to Miller in her capacity as assistant superintendent.

Homel reported an act of potential wrongdoing to her superior.  Courts have consistently held that doing so falls within an employee's professional responsibilities. *See, e.g., Garcetti*, 547 U.S. at 421-22 (holding that a deputy district attorney's memo to his superiors reporting potentially serious deficiencies in a warrant affidavit was not protected)*; Foraker*, 501 F.3d at 243 (holding that an employee reporting complaints up the

---

[12] Homel also pursues a novel theory that she had a First Amendment right not to ally with the Warminster board members and instead speak only to Miller.  Because Homel's "association" theory is inseparable from her free speech theory, we shall consider them part of one claim and apply the *Garcetti* analysis.  *See Gorum*, 561 F.3d at 185 n.4 (citing *Sanguigni v. Pittsburgh Bd. of Pittsburgh Educ.*, 968 F.2d 393, 400 (3d Cir. 1992)).

chain of command is acting within his job duties), *abrogated on other grounds by Borough of Duryea v. Guarnieri*, 131 S.Ct. 2488 (2011); *Cindrich*, 341 F. App'x at 787 (holding that a plaintiff's speech in chain-of-command letters was not protected); *O'Neill v. Phila. Hous. Auth.*, No. 11-0173, 2011 WL 2559716, at *2 (E.D. Pa. June 29, 2011) (holding that the plaintiffs acted within their job responsibilities when they reported allegations of other employees' wrongdoing to their superior and the employer's lawyers, even though their primary job responsibility was not to monitor and prevent such wrongdoing); *Armbruster v. Cavanaugh*, No. 09-1006, 2010 WL 816385, at *3 (E.D. Pa. Mar. 9, 2010) (holding that the plaintiff was "complaining about his job function up the chain of command of his department, and caselaw dictates this speech fell within his official duties").

Miller approached Homel because she was an administrator who he believed might have information relevant to his investigation.  She knew about the transaction because the kiln was purchased for the high school's art department when Homel was supervising the high school's operations as the district's director of secondary education.[13]   *See Gorum*, 561 F.3d at 185 ("We have held as well that a claimant's speech might be considered part of his official duties if it relates to 'special knowledge' or 'experience' acquired through his job.") (citing *Foraker*, 501 F.3d at 240).   As the district's assistant superintendent, the second highest position in CSD's administration, Homel had the authority and responsibility to investigate wrongdoing within the district.  Acting with this authority, she instructed the district's business manager, Timothy Vail, to produce the payment record for the kiln purchase in response to Miller's inquiry.  She was asked about

---

[13] The district's director of facilities, Victor Lasher, informed Homel about the purchase in 2007 because at that time she was director of secondary education.

the purchase in connection with her professional responsibilities.  Speaking about it was part of her job.

The undisputed facts belie Homel's argument that she was acting as a concerned citizen.  The record shows that she treated the kiln purchase as a work issue.  Although she learned about the purchase in 2007, she did not report it to the school board on her own initiative.  She claims that doing so was the superintendent's responsibility, not hers.  At no time did she take it upon herself to bring the purchase into the public light.[14]  She only reported the purchase when a school board member asked her about it.  She responded to the kiln purchase only to the extent that her job responsibilities required it.

We hold that Homel's First Amendment retaliation claim fails as a matter of law because Homel's statements to Miller are not constitutionally protected.[15]  Therefore, we shall grant the district's motion on this claim.[16]

---

[14] Courts have held that a public employee's speech is protected where the employee  spoke publicly in a forum accessible to the general public.  *See, e.g., Pickering v. Bd. of Educ.*, 391 U.S. 563, 572-73 (1968) (holding that the First Amendment protected a teacher's submission of a letter to a local newspaper criticizing the school board's funding decisions).  Conversely, when the employee only speaks to a supervisor or other employees, courts are more likely to hold that the employee was speaking pursuant to her job responsibilities.  *See, e.g., Garcetti*, 547 U.S. at 421-22 (holding that a deputy district attorney's memo to his superiors was not protected); *Miller v. Clinton Cnty.*, 544 F.3d 542, 550 (3d Cir. 2008) (holding that the First Amendment did not protect a probation officer's letter to a supervising judge complaining about the alleged misconduct of her supervisor); *Foraker*, 501 F.3d at 237 (holding that the First Amendment did not protect a state trooper's internal complaint); *Kutztown*, 455 F.3d at 242 (holding that the First Amendment did not protect a former borough manager's complaint to the city council about the mayor).

[15] In her response to the district's statement of uncontested facts, Homel also claims that her refusal to help board member Lynch's grandchild get into kindergarten is another basis for her First Amendment claim.  Assuming that Homel's actions in response to Lynch's request implicate the First Amendment, they are not protected for the same reason as Homel's conversations with Miller about the kiln purchase.  Homel acknowledges that Lynch approached her because she was a member of the school board who might be able to help her.  Homel therefore was speaking "pursuant to" her job duties, not as a public citizen.

[16] Because we conclude that Homel's speech is not protected because she was not speaking as a citizen, we need not determine whether the kiln purchase was a matter of public concern or whether CSD had an adequate justification for treating Homel differently from a member of the public.  Nor do we consider whether her speech was a substantial factor in the actions CSD took against her.

**Age Discrimination**

Homel alleges that CSD discriminated against her because of her age in violation of the ADEA and the PHRA with three adverse employment actions.  First, it removed her, the oldest administrator at CSD, without cause.  Second, it passed over her for district superintendent and instead hired an applicant 22 years her junior.  Third, it replaced her as director of secondary education while she was on forced administrative leave with an employee who is 24 years younger.[17]  In moving for summary judgment on this claim, CSD argues that Homel is not an "employee" protected by the ADEA and that she cannot meet her burden of persuasion to show that the district's actions were motivated by age bias.

The ADEA prohibits discrimination in hiring, discharge, "compensation, terms, conditions, or privileges of employment" on the basis of age.  29 U.S.C. § 623(a)(1) (2006).  Homel argues that CSD's justifications for taking actions against her are pretext for age discrimination.  Therefore, we apply the *McDonnell Douglas* burden-shifting framework familiar to Title VII race and sex discrimination claims.  *See Fasold v. Justice*, 409 F.3d 178, 184 (3d Cir. 2005) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)); *see also Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009) (holding that the *McDonnell Douglas* framework still applies to ADEA claims after the Supreme Court's decision in *Gross v. FBL Fin. Servs*, 129 S.Ct. 2343 (2009)).

If Homel makes out a *prima facie* case, the burden of production shifts to CSD "to

---

[17] It is disputed whether Homel was actually replaced by Khalid Mumin, a 38-year-old man, as director of secondary education.  CSD argues that Homel relinquished that position when she became assistant to the superintendent. Homel counters that she held both positions simultaneously.

identify a legitimate non-discriminatory reason for the adverse employment action." *Smith*, 589 F.3d at 690 (citing *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997)). If the district satisfies that burden, Homel then must demonstrate that the employer's proffered rationale was a pretext for age discrimination. *Id.* (citing *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1095 n.4 (3d Cir. 1995)). This final burden of production "merges with the ultimate burden of persuading [the jury] that she has been the victim of intentional discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). The ultimate burden of persuasion, including the burden to show that discriminatory intent was a "but-for" cause of the district's adverse employment actions, rests with Homel at all stages of the proceeding. *Smith*, 589 F.3d at 690-691 (citing *Gross v. FBL Fin. Servs.*, 129 S.Ct. at 2349-51).

To make out a *prima facie* case of age discrimination, Homel must show that: (1) she is 40 years of age or older; (2) the district took an adverse employment action against her; (3) she was qualified for the position for which she applied or from which she was removed; and (4) she "was ultimately replaced by another employee who was sufficiently younger to support an inference of discriminatory animus." *Id.* (citing *Potence v. Hazleton Area Sch. Dist.*, 357 F.3d 366, 370 (3d Cir. 2004)).

Homel has made out a *prima facie* case on her claim that the district discriminated against her when it failed to hire her for the superintendent position in 2011. She was 62 years of age at the time she applied for the position; she was not hired as superintendent; she was qualified to be superintendent;[18] and she was passed over for 40-year-old

---

[18] The district does not dispute this.

candidate Jennifer Cressman.  *See Sempier v. Johnson & Higgins*, 45 F.3d 724, 729 (3d Cir. 1995) (holding that the plaintiff need not show any specific age difference to satisfy the fourth element of the prima facie case, and that even a five-year difference can be sufficient) (citations omitted).

The district puts forward a number of reasons for not hiring Homel, which boil down to a contention that a majority of the school board members found her a divisive figure in the CSD administration.  Some of the board members felt that Homel was improperly allying herself with a minority faction of the board against the majority.  Other members simply did not like her management style.  In contrast, the district argues, a majority of the board members thought that Cressman would be a unifying presence in the school administration.  In short, CSD contends that it made a managerial decision, not one based on age.  CSD has met its burden of production to show that it had non-discriminatory reasons for its employment decisions.

Homel's ADEA claim falters at the third *McDonnell* step.  To meet her burden of persuasion to show that age bias was a "but-for" cause of CSD's actions against her, *see Smith*, 589 F.3d at 690-91, Homel must present evidence from which the jury could either "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted). Other than making conclusory statements that it was, Homel offers no evidence beyond her *prima facie case* that the board was motived by age bias in taking any of its adverse

employment actions.[19]  *See Blanchard v. Gallick*, No. 11-2957, 2011 WL 4867556, at *2 (3d Cir. Oct. 14, 2011) (holding that a conclusory allegation of liability is insufficient to avoid summary judgment (citing *Olympic Junior, Inc. v. David Crystal, Inc.*, 463 F.2d 1141, 1146 (3d Cir. 1972))).  She tries to meet her burden only by attacking CSD's articulated reasons as untruthful.

Homel attacks CSD's stated reasons in two ways.  First, she challenges the factual assertions on which CSD's reasons are based. She claims that the school board members who now criticize her performance never made any such complaints previously, which belies CSD's argument that the board was unhappy with her performance.  She also contends that Cressman is far less qualified to be superintendent than she is.  Second, she presents an alternative account of why the school board took actions against her.  She argues that CSD retaliated against her because of her EEOC complaints and her refusal to accept Lynch's *quid pro quo* offer.

Homel's pretext arguments fail because she concedes that age was not a "but-for" cause of CSD's actions against her.  Whether a jury would believe CSD's or Homel's proffered reasons for the adverse employment actions is immaterial.  Neither set of reasons tends to show that age bias was a determinative factor.  *See Fakete v. Aetna, Inc.*, 308 F.3d 335, 337 (3d Cir. 2002) ("To prevail on an ADEA termination claim, a plaintiff

---

[19] Homel mentions that two other administrators who are close to her in age suffered similar mistreatment.  She does not make any age discrimination claim based on this fact.  Even if she did, this does not create an inference of age discrimination sufficient to overcome summary judgment.  Homel provides no contextual evidence to suggest that CSD had a culture or pattern of age discrimination.  She does not provide statistical evidence to show that CSD generally treated older administrators worse than younger ones.  *See, e.g., Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994).  She does not offer any other circumstantial evidence, such as derogatory comments by school board members, to show that the actions against the other administrators were because of age bias.  *See, e.g., Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 527-28 (7th Cir. 2008) (citing *Troupe*, 20 F.3d at 737).  Standing alone, this fact only shows that two other administrators of roughly the same age were mistreated.

must show that his or her age 'actually motivated' and 'had a determinative influence on' the employer's" adverse action. (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000))); *see also Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003) ("That circumstantial evidence, however, must point directly to a discriminatory reason for the employer's action.").

A plaintiff need not always put forward evidence of age discrimination beyond what is required for her *prima facie* case.  A plaintiff may, in some cases, meet her ultimate burden of persuasion simply by making out a *prima facie* case and establishing that the employer's allegedly non-discriminatory reasons are pretext.  *See Reeves*, 530 U.S. at 147 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)).  In those cases, the plaintiff proves that age discrimination was the cause of the adverse employment action by showing that no other believable reason for the action exists.  *Id.*  This is not such a case because Homel contends that CSD had a non-age discriminatory motive.

Without saying so, Homel tries to use a mixed motives theory to prove age discrimination.  Prior to the Supreme Court's decision in *Gross*, a plaintiff could prevail on a summary judgment motion by offering evidence to show that discrimination was a substantial factor among other factors in the adverse employment actions.  *See Fakete*, 308 F.3d at 338 (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 265-66 (1989)).  When a plaintiff did so, the burden of persuasion shifted to the employer to show that it would have taken the action regardless of the plaintiff's age.  *Id.*  The Supreme Court held in *Gross*, however, that this burden-shifting mechanism did not apply to age discrimination cases.  *Gross*, 129 S.Ct. at 2350-51; *see also Smith*, 589 F.3d at 690-691.  Thus, the burden remains with Homel to show that age discrimination was a determinative factor in

CSD's actions, not merely a substantial one among several.  She cannot meet that burden.[20]

The PHRA's age discrimination protections are identical to the ADEA's.  *See Fasold*, 409 F.3d at 184 n.8 (3d Cir. 2005) (quoting *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002)).  Thus, for the reasons stated in our ADEA analysis, we shall grant CSD's motion for summary judgment on Homel's age discrimination PHRA claim as well as the ADEA claim.

## Sex Discrimination

Homel alleges that CSD discriminated against her on the basis of her sex in violation the Equal Protection Clause, Title VII, and the PHRA.  The standard for proving sex discrimination by disparate treatment is identical under each of these three laws. *Stewart v. Rutgers, The State Univ.*, 120 F.3d 426, 432 (3d Cir. 1997) (the same standards apply to proving intentional discrimination under the Equal Protection Clause and Title VII (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 n.1 (1993))); *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 409-10 (3d Cir. 1999) (the same standards apply to Title VII and the PHRA).

### Statute of Limitations

As a threshold matter, we must determine how the applicable statutes of limitations impact her various causes of action.  Each of the three statutes upon which Homel relies

---

[20] Because we hold that Homel cannot meet her ultimate burden of persuasion, we need not address CSD's argument that Homel is not an "employee" under the ADEA.

has a different statute of limitations.  Any adverse discriminatory action that forms the basis of Homel's sex discrimination claims must have occurred within each statute's limitations period.  *See Talbert v. Judiciary of N.J.*, 420 F. App'x 140, 142 (3d Cir. 2011).  Hence, we must determine which of CSD's alleged actions against Homel can form the basis of her claims under each statute separately.

Homel alleges that the district did the following[21]: forced her to perform three and four jobs without assistance while only paying her for one from July 2007 to January 2010; initially promoted her to the lower-paying and less prestigious position of assistant to the superintendent, rather than assistant superintendent, in July 2007; failed to promote her to superintendent in March 2009; undermined her authority as assistant superintendent by requiring the elementary school principals to report directly to the superintendent in August 2009; forced her to accept a "without cause" termination provision in her employment contract and then used it to remove her as assistant superintendent on January 11, 2010; failed to hire her as superintendent in January-February 2011; and terminated her employment in August 2011.

*a. Section 1983 claim*[22]

---

[21] Homel alleges that the district engaged in a slew of unlawful or otherwise unsavory actions against her, and she does not specify which of those constitute adverse employment actions and which are merely evidence of discriminatory intent.  For the purposes of our statute of limitations analysis, we consider those actions that might plausibly be considered adverse employment actions.

[22] CSD argues that Homel's entire § 1983 claim is barred as a "class of one" claim.  However, Homel is not proceeding as a class of one.  *See Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 604-05 (2008) (defining a "class of one" claim as one in which a plaintiff argues that she was treated irrationally irrespective of her membership in a protected class).  Although a number of CSD's allegedly discriminatory actions were taken only against her, Homel alleges that those actions were taken because she is female, and as part of CSD's practice of discriminating against female administrators.

Homel alleges that CSD violated her Fourteenth Amendment right to equal protection by discriminating against her because of her sex. State personal injury tort law provides the appropriate statute of limitations for claims brought under § 1983. *See Wallace v. Kato*, 549 U.S. 384, 387 (2007). In Pennsylvania, a personal injury claim must be filed within two years. 42 Pa. Cons. Stat. § 5524(2) (2004). Thus, the statute of limitations for § 1983 claims in Pennsylvania is two years. *Kach v. Hose*, 589 F.3d 626, 634 (3d Cir. 2009).

Homel filed her original complaint on March 23, 2011. Accordingly, she may only base her claims on adverse employment actions that occurred on or after March 23, 2009.

Six of these actions survive the statute of limitations. They are: forcing her to perform three and four jobs without assistance while only paying her for one from July 2007 to her termination in June 2011;[23] failing to promote her to superintendent on March 30, 2009; undermining her authority over the elementary school principals on August 19, 2009;[24] removing her without cause from her position as assistant superintendent and placing her on administrative leave on January 11, 2010;[25] terminating her employment in

---

[23] This alleged action survives under the "continuing violations doctrine," which is "an equitable exception to the timely filing requirement." *Soppick v. Borough of W. Conshohocken*, 118 F. App'x 631, 635 (3d Cir. 2004) (quoting *Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001) (internal quotations omitted)). To avail herself of this theory, Homel must show that: 1) at least one act occurred within the statutory period; and 2) the prior conduct was not isolated or sporadic, but was part of a continuing, ongoing pattern. *Id.* (quoting *West v. Phila. Elec. Co.*, 45 F.3d 744, 754-55 (3d Cir. 1995)). Homel meets this standard because she alleges that she was constantly forced to perform the duties of multiple positions while only being paid for one over the course of four years.

[24] We do not decide whether this action satisfies the municipal liability doctrine under *Monell* because Homel fails to establish that it was sufficiently adverse to her working conditions to constitute an "adverse employment action."

[25] Although the initial decision to remove Homel was made by Turnbaugh and not the school board, we conclude that the school board can be held liable under the *Monell* doctrine because it ratified Turnbaugh's decision. *See Hill v. Borough of Kutztown*, 455 F.3d 225, 245 (3d Cir. 2006) (holding that municipal liability can be established by showing that the final decision-maker ratified the subordinate's decision); *McGreevy*

August 2010, effective June 30, 2011; and failing to hire her as superintendent in January-February 2011.  CSD's decision to promote her to assistant to the superintendent instead of assistant superintendent in July 2007 is time barred.

### b. Title VII claim

Homel bases her Title VII gender discrimination claim on the same adverse employment actions as her § 1983 claim. The statue of limitations for her Title VII causes of action is not the same as for her § 1983 claims.

A plaintiff must file a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) or its state equivalent within 300 days of the alleged unlawful action.  *Mikula v. Allegheny Cnty.*, 583 F.3d 181, 183 (3d Cir. 2009); *West v. Phila. Elec. Co.*, 45 F.3d 744, 754 (3d Cir. 1995).[26]

On April 13, 2010, Homel filed her first charge with the EEOC regarding the district's failure to promote her to superintendent on May 30, 2009, its undermining of her authority over the elementary school principals on August 19, 2009, and its removing her from the position of assistant superintendent on January 11, 2010.  Because the alleged actions of intentional discrimination must have occurred on or after June 17, 2009–300 days before

---

*v. Stroup*, 413 F.3d 359, 367 (3d Cir. 2005) (citing *City of St. Louis v. Praprotnik*, 485 U.S 112, 127 (1988)); *see also Amnesty America v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004).  Turnbaugh's decision is therefore attributable for the purposes of municipal liability.  The board members discussed the decision shortly after it occurred, and CSD admits that most members favored Homel's removal.  The board later voted to make her removal permanent by voting not to renew her contract.  A school board is considered the equivalent of a municipal government for the purposes of *Monell* analysis.  *See Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658 at 696-97 (1978).

[26] A plaintiff must ordinarily file her charge with the EEOC within 180 days of the discriminatory act. 42 U.S.C. § 2000e-5(e)(1) (2006).  However, in jurisdictions where there is a parallel state administrative entity for investigating complaints of discrimination, such as Pennsylvania, a plaintiff has 300 days to file.  *See Watson v. Eastman Kodak Co.*, 235 F.3d 851, 854 (3d Cir. 2000); 29 CFR 1601.74(a) (2011).

she filed her EEOC charge–Homel's Title VII cause of action for CSD's failure to hire her as superintendent on May 30, 2009 is barred.  Her other two claims in the April 13, 2010, charge are not barred.

On June 15, 2010, Homel filed her second EEOC charge.  In it she alleged that the district forced her to work multiple jobs while only paying her for one.[27]  Because Homel alleges that this adverse employment action began prior to August 19, 2009–300 days before June 15, 2010–this claim implicates the "Lilly Ledbetter Fair Pay Act of 2009" (the "Fair Pay Act") Pub. L. No. 111-2, 123 Stat. 5, which amended 42 U.S.C. § 2000e-5(e). The amendment is applicable "to all claims of discrimination in compensation under Title VII of the Civil Rights Act of 1964 . . .  that are pending on or after" May 28, 2007.  Pub. L. 111-2, § 6.

Finding that "the Supreme Court in *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618 (2007), significantly impairs statutory protections against discrimination in compensation" and that the "decision undermines those statutory protections by unduly restricting the time period in which victims of discrimination can challenge and recover for discriminatory compensation decisions or other practices," *Id.* § 2(1), Congress passed the Lilly Ledbetter Fair Pay Act of 2009.  It amended §2000e-5 as follows:

> For purposes of this section, an unlawful employment practice occurs, with respect to discrimination in compensation in violation of this title, when a discriminatory compensation decision or other practice is adopted, when an individual becomes subject to a discriminatory compensation decision or other practice, or when an individual is affected by application of a discriminatory compensation decision or other practice,

---

[27] In her June 15, 2010 charge, Homel claimed that she was forced to work two jobs while only being paid for one.  In her January 11, 2011 EEOC charge, she alleged that she was forced to work as many as four jobs while only being paid for one.

> including each time wages, benefits, or other compensation is
> paid, resulting in whole or in part from such a decision or other
> practice.

42 U.S.C. § 2000e-5(e)(3)(A) (2006).   Thus, Homel must show that she received

paychecks pursuant to CSD's previously made discriminatory policy within the 300-day

period.

Homel satisfies this requirement because she alleges that she was paid only as

assistant superintendent on and after August 17, 2009–300 days prior to June 15,

2010–even though she was entitled to compensation for two or three other positions.

The Fair Pay Act, as its title connotes, applies only to discrimination in

compensation.  *Noel v. The Boeing Co.*, 622 F.3d 266, 273 (3d Cir. 2010).  It does not

apply to all adverse employment actions that may affect compensation, such as a failure

to promote.  *Id.*  Discrimination in compensation "means paying different wages or

providing different benefits to similarly situated employees. . . ."  *Id.* (quoting *Schuler v.

PricewaterhouseCoopers, LLP*, 595 F.3d 370, 374 (D.C. Cir. 2010)).   To assert a

discrimination in compensation claim, a plaintiff must plead that there is a nexus between

the adverse employment action and the resultant lower salary.  *Id.* at 272.

It appears that Homel's claim about being forced to hold several jobs while only

being paid for one is a claim of discrimination in compensation.  She alleges that CSD

made her do work for free that it later paid other employees, two of whom are male, to do.

If Homel is correct, she was paid less to do the same work as similarly situated

employees.[28]  *Id.* at 274 ("To maintain a pay disparity claim, a plaintiff must demonstrate that employees were paid differently for performing 'equal work'–work of substantially equal skill, effort and responsibility, under similar working conditions.") (quoting *Stanziale v. Jargowsky*, 200 F.3d 101, 107 (3d Cir. 2000) (internal quotations and alterations omitted)). This evidence can show a nexus between CSD's actions and her lower salary.  Thus, the Fair Pay Act's statute of limitations applies to Homel's claim.

Homel filed a third charge on January 11, 2011.  There she alleged that CSD terminated her employment in August 2010, effective June 30, 2011.  Because this occurred after March 17, 2010–300 days prior to January 11, 2011–it is not barred by the statute of limitations.

Homel filed her fourth EEOC charge on May 10, 2011.  In it she alleged that CSD failed to promote her to superintendent in January-February 2011.  This claim is not barred because it occurred after July 14, 2010–300 days prior to May 10, 2011.

Homel never alleged before the EEOC that she had been offered the position of assistant to the superintendent instead of assistant superintendent.  Thus, that claim is barred by Title VII.

### c. PHRA claims

Homel makes no additional factual allegations for her PHRA claim.  A complaint of discrimination in violation of the PHRA must be filed with the Pennsylvania Human Rights

---

[28] Because Homel has alleged discrimination in compensation, we do not apply the "continuing violations" doctrine.  That doctrine allows a plaintiff to base her claims on actions that occurred outside the statutory period where those actions are part of a continuous discriminatory pattern.  *See Rush v. Scott Specialty Gases*, 113 F.3d 476, 480 (3d Cir.1997) (quoting *West v. Phila. Elec. Co.*, 45 F.3d at 754).  Discrete employment actions such as the issuance of discriminatory paychecks cannot be part of a continuing violation.  *See Mikula*, 583 F.3d at 185-86.

Commission (PHRC) within 180 days of the alleged wrongful act.  *Woodson v. Scott Paper Co.*, 109 F.3d 913, 925 (3d Cir.1996); 43 Pa. Stat. Ann. §§ 959(a), 962 (West 2011).  When Homel filed her EEOC complaints, she elected to have the agency cross-file them with the PHRC.  Thus, we consider her EEOC and PHRC complaints filed on the same day.  *See Ryan v. Gen. Mach. Prods.*, 277 F. Supp. 2d 585, 591 (E.D. Pa. 2003).

On April 13, 2010, Homel filed her initial EEOC charge.  She alleged that CSD failed to promote her to superintendent on May 30, 2009, undermined her authority over elementary school principals on August 19, 2009, and removed her from the position of assistant superintendent on January 11, 2010.  The first two claims are barred under the PHRA because they occurred prior to October 15, 2009, and therefore more than 180 days before she filed her charge.  Homel's claim that she was removed in January 2010 survives.

In her June 15, 2010, EEOC charge, Homel claimed that she was forced to work multiple jobs while only being paid for one.  This claim raises the question of whether the Fair Pay Act's changes to Title VII affect our statute of limitations analysis under the PHRA.

The Third Circuit has held that the PHRA  "is to be treated as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently."  *Fogleman*, 283 F.3d at 567 (citing *Dici v. Commonwealth*, 91 F.3d 542, 552 (3d Cir. 1996)).  Prior to the *Ledbetter* decision and the Fair Pay Act, both Title VII and the PHRA counted each paycheck issued pursuant to a discriminatory decision as a discrete action for statute of limitations purposes.  *See Mikula*, 583 F.3d at 184-86 (holding that Title VII counted each paycheck as a discrete action prior to *Ledbetter*); *Barra v. Rose Tree Media Sch. Dist.*, 858 A.2d 206, 213 (Pa. Cmwlth. 2004)

(holding the same as to both Title VII and the PHRA).  As a result of the Fair Pay Act, Title VII now contains language specifying that each paycheck constitutes a discrete employment action.  The PHRA contains no such language.  The Third Circuit has not decided whether this difference warrants interpreting Title VII and the PHRA's statutes of limitation differently.[29]

We conclude that the PHRA's statute of limitations provision remains the same as it was prior to *Ledbetter* and the Fair Pay Act.  According to the Third Circuit, the Fair Pay Act's purpose was to "restore the law that was in place prior to the *Ledbetter* decision." *Mikula v. Allegheny Cnty.*, 583 F.3d at 185; *see also Schengrund v. Pa. State Univ.*, 705 F. Supp. 2d 425, 438 (M.D. Pa. 2009).  Given that purpose, there is no reason to read one statute's amendments into the other.  Furthermore, Congress did not simply alter Title VII after *Ledbetter*.  It repudiated the decision as contrary to established law.  Given that *Ledbetter* adopted an incorrect reading of Title VII, we will not apply that reading to the PHRA.

To succeed under the PHRA, Homel must have received discriminatory paychecks on or after December 17, 2009–180 days prior to June 15, 2010.  Because she continued to receive paychecks until her termination in June 2011, this claim survives the PHRA's statute of limitations.

---

[29] In *Schengrund v. Pa. State Univ.*, 705 F. Supp. 2d 425, 437-38 (M.D. Pa. 2009) and *Summy-Long v. Pa. State Univ.*, No. 06-1117, 2010 WL 1253472, at *7 (M.D. Pa. Mar. 24, 2010), *modified on reh'g*, *Summy-Long v. Pa. State Univ.*, No. 6-1117, 2010 WL 4514312 (M.D. Pa. Nov. 2, 2010), the defendant argued that the Supreme Court's *Ledbetter* decision changed the interpretation of the PHRA when it ruled on Title VII because both acts are generally to be interpreted identically.  According to the defendant, because the Fair Pay Act changed the language of Title VII, and because the Fair Pay Act's new language does not appear in the PHRA, the two statutes should now be interpreted differently.  According to this argument, *Ledbetter* still applies to the PHRA because it interpreted the language of Title VII when the two statues were the same, even though it no longer applies to Title VII's post-Fair Pay Act language.

Homel filed a third charge on January 11, 2011.  There she alleged that CSD terminated her employment in August 2010, effective June 30, 2011.  Because this occurred after July 15, 2010–180 days prior to January 11, 2011–it is not barred by the statute of limitations.

Homel alleged in her May 10, 2011 EEOC charge that CSD failed to hire her as superintendent in January-February 2011.  This claim is not barred because the action occurred within 180 days prior to June 15, 2011.

Homel never alleged before the EEOC that she had been offered the position of assistant to the superintendent instead of assistant superintendent.  Thus, that claim is barred by the PHRA for the reason stated in the Title VII analysis.

*Adverse Employment Actions*

We must now determine which of CSD's alleged actions against Homel that occurred within the statute of limitations constitute "adverse employment actions" forming the basis of Homel's direct or indirect claims.  An "adverse employment action" is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change in benefits."  *Weston v. Pennsylvania*, 251 F.3d 420, 431 (3d Cir. 2001) (quoting *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 749 (1998)).  "Minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action."  *Clegg v. Ark. Dep't of Corr.*, 496 F.3d 922, 926 (8th Cir. 2007) (quoting *Higgins v. Gonzales*, 481 F.3d 578, 584 (8th Cir. 2007) (internal quotations omitted)).  Homel carries the burden of demonstrating that

CSD's alleged actions against her were sufficiently detrimental to form the basis of her sex discrimination cause of action. *See Colon-Fontanez v. Municipality of San Juan*, 660 F.3d 17, 42 (1st Cir. 2011).

Of the actions Homel alleges CSD took against her that survive the various statutes of limitations, all but one are significant enough to meet the definition of an "adverse employment action." CSD's failure to promote Homel to superintendent, its placing her on administrative leave, and its termination of her employment, clearly meet the Third Circuit's definition in *Weston* of a "significant change in employment status, . . . or a decision causing a significant change in benefits." 251 F.3d at 431 (quoting *Burlington Indus.*, 524 U.S. at 749). This includes the district's failure to promote her to superintendent in favor of Cressman in 2011, even though Cressman is also female. Although the fact that Homel was passed over for another woman is strong evidence against an inference of sex discrimination, this fact alone does not bar Homel's claim. *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996) ("The fact that one person in the protected class has lost out to another person in the protected class is . . . irrelevant, so long as he has lost out because of [prohibited discrimination]."); *Connecticut v. Teal*, 457 U.S. 440, 445 (1982) (holding that "Congress never intended to give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group"). It is for the factfinder to determine whether, despite CSD's decision to hire a female superintendent, the district discriminated against Homel because of her sex. Additionally, the assignment of additional, burdensome responsibilities is an adverse employment action, particularly when those responsibilities do not come with additional pay. *See Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th

Cir. 2008); *Ledbetter v. Alltel Corporate Servs., Inc.*, 437 F.3d 717, 724 (8th Cir. 2006).

Homel fails to establish that Turnbaugh's ordering the district's elementary school principals to report directly to him rather than to Homel "adversely affect[ed] [her] status as an employee." *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1297 (3d Cir. 1997) (quoting 42 U.S.C. § 2000e-2(a)(2)), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53 (2006). An employer's decision to relinquish an employee of supervisory authority may constitute an adverse employment action. *See Simas v. First Citizens' Fed. Credit Union*, 170 F.3d 37, 50 (1st Cir.1999). However, such decisions may simply be the result of organizational restructuring or an employer's prerogative to free-up the employee for other work. *See Colon-Fontanez,* 660 F.3d at 42. The plaintiff must show that the decision significantly harmed her working conditions, and was not merely unwanted or unpleasant. *Id.* Homel has not done so. She states only that Turnbaugh made the decision. She points to no evidence of the decision's meaning or effect. Therefore, bypassing Homel in the reporting structure cannot form the basis of her sex discrimination claim.

*Genuine Issues of Material Fact*

We now determine whether Homel has demonstrated the existence of genuine issues of material fact such that summary judgment is inappropriate for her sex discrimination claim. A claim of intentional employment discrimination, disparate treatment, may be proven by either "direct" evidence of discriminatory intent or "indirect" evidence from which one can infer an intent to discriminate. *See Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 364 (3d Cir. 2008) ("C.A.R.S."); *Logue v. Int'l Rehabilitation*

*Assocs.*, 837 F.2d 150, 153 (3d Cir. 1988) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 257 (1981).  Homel proceeds under the indirect method, also called the "pretext" theory.[30]

Relying on the pretext method, Homel must prove sex discrimination using the *McDonnell Douglas* burden-shifting test.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *see also Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 409 (3d Cir. 1999) (applying the *McDonnell Douglas* test to Title VII and PHRA claims).  She bears the initial burden of showing that: (1) she is a member of a protected class; (2) she was qualified for the position she held or sought; (3) she suffered an adverse employment action; and (4) nonmembers of the protected class were treated more favorably.  *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 318-19 (3d Cir. 2000).  If she does, the burden shifts to CSD to show that it had legitimate, nondiscriminatory reasons for taking the actions against Homel.  *C.A.R.S.*, 527 F.3d at 364.  The burden then reverts back to Homel to show that CSD's articulated reasons are pretext for discrimination.  *Id.*  The ultimate burden of persuading the fact-finder that CSD intentionally discriminated against her because of her sex always remains with Homel.  *Burdine*, 450 U.S. at 256.

Homel has made out a *prima facie* case of sex discrimination.  She is a woman; she was qualified for the positions she held and for which she applied;[31] she suffered a number of adverse employment actions as discussed above; and she alleges that male district administrators received various forms of preferential treatment in hiring, promotion, and

---

[30]  Homel does not say explicitly which theory she uses.  Because she refers to the *McDonnell Douglas* framework in her brief, we understand her to be proceeding under the indirect method.

[31]  The district does not dispute this.

working conditions.

CSD has met its burden to put forth legitimate, nondiscriminatory reasons for the actions it took with respect to Homel.  Primarily, it presents testimony of the school board members that Homel had become a divisive figure in the CSD administration, as well as hiring data to show that women hold many prominent positions–including that of superintendent–in the district.

To attack CSD's reason as pretextual, Homel must present evidence from which the jury could either "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted).  Homel offers both.  As to the first form of evidence, she argues that she was always well-regarded throughout her tenure in the CSD administration and never received any complaints about her performance.  As to the second form, Homel points to the existence of the termination without cause provision in her contract, which she alleges was only present in female administrators' contracts prior to her filing this suit.  *See Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994) (holding that evidence of a discriminatory intent includes suspicious circumstances surrounding the actions against the plaintiffs, behavior toward other employees in the protected group, and systematic differences in the way the employer treats members of the protected and non-protected groups).  She argues that the decision to offer her the newly created and less prestigious position of assistant to the superintendent, rather than that of assistant

superintendent, is additional evidence of discrimination.[32]   She also presents her own testimony and that of several other CSD administrators that the district administrator fosters an "old boys club" atmosphere that protects male administrators and devalues the work of female administrators.   Homel's evidence of a discriminatory culture at CSD includes several complaints of sexual harassment and other discriminatory behavior filed by other female administrators.

Homel has presented evidence from which the jury could find that CSD's stated reasons for taking actions against her are pretext for discrimination.  The jury must decide whose version of the facts is more credible.[33]

---

[32] Although this action is not an "adverse employment" action because the statutes of limitations have run, Homel may present it as circumstantial evidence of the district's discriminatory motive.  *See Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 176 (2d Cir. 2005) ("The statute of limitations requires that only one alleged adverse employment action have occurred within the applicable filing period.  But, evidence of an earlier alleged retaliatory act may constitute relevant background evidence in support of that timely claim." (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) (internal alterations and quotations omitted))); *Roebuck v. Drexel Univ.*, 852 F.2d 715, 733 (3d Cir. 1988) (holding that a decisionmaker's statements exhibiting racial bias could add support to the plaintiff's claim of racial discrimination, even though they occurred too far in the past to stand alone as an incident of racial discrimination).

[33] Our decision would be the same even if Homel used the direct method.  Under the direct method, also referred to as a "mixed motives" theory, the plaintiff bears the initial burden of establishing that sex was a substantial factor in the employer's actions against her.  *See Fakete v. Aetna, Inc.*, 308 F.3d 335, 338 (3d Cir. 2002) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 265-66 (1989)).  If she does, the employer then bears the burden to show that it would have taken the adverse employment actions regardless of the plaintiff's sex.

In making her indirect case, Homel does not simply attack CSD's articulated reasons for its actions as unbelievable.  Rather, she puts forth affirmative evidence that sex discrimination is the real reason behind CSD's adverse employment actions.  When a plaintiff does so, the direct and indirect theories overlap.  Under either, the core question for summary judgment is whether a reasonable jury could believe the plaintiff's affirmative evidence of sex discrimination.  The standard under the direct theory is lower at this stage, because the plaintiff need only put forth evidence from which a reasonable jury could conclude that sex discrimination was a substantial factor in the employer's decisions.  Because a reasonable jury could decide under the pretext theory that sex discrimination, rather than CSD's articulated reasons, was the real reason for CSD's actions against Homel, we conclude that a reasonable jury could also hold under the mixed motives theory that sex discrimination was a substantial factor.

**Title VII and PHRA Retaliation**

Lastly, we consider Homel's claim that CSD retaliated against her because she filed charges with the EEOC.  Title VII prohibits an employer from discriminating against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing . . . ."  42 U.S.C. § 2000e-3(a) (2006). The PHRA provides identical substantive protections against retaliation as Title VII.  Thus, we therefore consider Homel's Title VII and PHRA retaliation claims together.  *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 409-10 (3d Cir. 1999).

*Statute of Limitations*

As with Homel's sex discrimination claims, we must first determine whether her retaliation claims satisfy the applicable statute of limitations.  Homel must have filed a charge with the EEOC or the state equivalent within 300 days of the allegedly retaliatory action.  She must have filed her charge within 180 days for the PHRA.[34]

Homel originally filed with the EEOC on April 13, 2010, and again on June 15, 2010. On January 11, 2011, she filed a third EEOC charge alleging that CSD terminated her employment in August 2010 in retaliation for making her first two charges.  Because August 2010 is after March 17, 2010–300 days prior to January 11, 2011–CSD's decision to terminate her employment may form the basis of her Title VII retaliation claim.  Because August 2010 is after July 15, 2010–180 days prior to January 11, 2011–that action may

---

[34] Homel filed her charges with the EEOC and Pennsylvania's Human Rights Commission (PHRC) simultaneously.

also form the basis of her PHRA retaliation claim.

On May 10, 2011, Homel filed her fourth EEOC charge, alleging that CSD failed to hire her as superintendent in January-February 2011 because she had filed the January 11, 2011, charge.  Because January 2011 is after July 14, 2010–300 days prior to May 10, 2011–CSD's failure to hire her as superintendent may form the basis of her Title VII claim. Because January 2011 is after November 11, 2010–180 days prior to May 10, 2011–that action may also form the basis of her PHRA claim.

*Genuine Issues of Material Fact*

As with her Title VII discrimination claim, Homel can seek to prove unlawful retaliation using either a direct or indirect method of proof.  *See Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 512 (3d Cir.1997).  Again, Homel proceeds with the indirect method.[35]

To make out a *prima facie* case of Title VII retaliation under the indirect method using the *McDonnell Douglas* framework, Homel must show that: (1) she engaged in protected activity; (2) CSD took an adverse employment action against her; and (3) there was a causal connection between Homel's activity and CSD's action.  *See Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006) (citing *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)).  If Homel does so, the burden shifts to CSD to advance a legitimate, non-retaliatory reason for its actions.  *Id.* at 342.  If CSD succeeds, the burden is Homel's to persuade the jury that CSD's articulated reasons are pretext for its unlawful retaliation.

---

[35] As with her sex discrimination claim, *see supra*, note 30, Homel does not state explicitly which theory she uses.  Because she references the *McDonnell Douglas* framework, we understand her to be using the indirect method.

*Id.*

Homel makes out a *prima facie* case of retaliation.  Homel filed EEOC charges on June 15, 2010 and January 11, 2011.  Two months after her June 15, 2010 charge, the school board voted to terminate her employment.  Within a month of Homel's January 11, 2011 charge, CSD hired Cressman, instead of her, as superintendent.  The close proximity of these actions and the filing of the EEOC charges provides evidence of a causal connection.  *See Jensen v. Potter*, 435 F.3d 444, 450 (3d Cir. 2006) (holding that the timing of alleged retaliatory acts can be evidence of a retaliatory motive), *abrogated on other grounds by Burlington N. & Santa Fe. Ry. Co. v. White*, 548 U.S. 53 (2006).

CSD has met its burden to put forth legitimate, non-retaliatory reasons for its actions. It argues, as it does regarding Homel's sex discrimination claims, that it took actions against Homel because the school board saw her as a divisive figure in the administration.

Homel attacks CSD's articulated reasons as pretextual in the same way she does for her sex discrimination claims–by arguing both that CSD's reasons are not believable and that retaliation was the real reason for CSD's actions.  *See Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).  She claims that CSD's reasons are not believable because she was well-regarded during her tenure and never received any complaints about her performance.  To prove CSD's retaliatory motive, Homel presents evidence that the CSD had a pervasive culture of retaliating against women who engaged in similarly protected activity and generally did not take her and other female administrators' complaints seriously.  She complains that members of the school board laughed at her complaint and that CSD refused to investigate her claims.

Homel has established the existence of genuine issues of material fact regarding why CSD took its actions against Homel.  It is up to the jury to determine whose explanation is more persuasive.[36]

### Conclusion

For the reasons stated, we shall grant CSD's motion for summary judgment on Homel's First Amendment retaliation and age discrimination claims.  We shall deny the motion on her Title VII/PHRA retaliation claims.  We shall grant in part and deny in part CSD's motion with respect to the sex discrimination claim.

We shall grant the motion as to Homel's § 1983, Title VII, and PHRA sex discrimination causes of action regarding her claims that CSD failed to promote her to assistant superintendent in 2007 and required the elementary school principals to report directly to the superintendent in 2009; and her Title VII and PHRA sex discrimination causes of action regarding her claim that CSD failed to promote her to superintendent in 2009.  We shall deny the motion as to her remaining claims.  Thus, trial will proceed on her §1983 cause of action regarding her claim that CSD failed to promote her to superintendent in 2009; and her § 1983, Title VII, and PHRA causes of action regarding her claims that CSD forced her to work multiple jobs while only paying her for one, removed her as assistant superintendent in January 2010, terminated her employment in August 2010, and failed to hire her as superintendent in 2011.

---

[36] As with Homel's sex discrimination claim, our decision regarding her retaliation claim would be the same if she proceeded under the direct method.  *See supra*, note 33.  Her evidence that CSD's stated reasons are pretext for retaliation also establishes triable issues regarding whether a retaliatory motive was a substantial factor in CSD's actions against her.